# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **KATHERINE SWEENEY**, | § | **Case No. 4:25-cv-00392-O** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| **ASSOCIATION OF** | § | |
| **INDEPENDENT MORTGAGE** | § | |
| **EXPERTS, UNITED** | § | |
| **WHOLESALE MORTGAGE,** | § | |
| **LLC, and SARAH DECIANTIS** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

---

**DEFENDANT ASSOCIATION OF INDEPENDENT MORTGAGE EXPERTS' ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED COMPLAINT (ECF NO. 42) AND COUNTERCLAIMS AGAINST PLAINTIFF KATHERINE SWEENEY**

Defendant Association of Independent Mortgage Experts ("AIME"), as and for its Answer, Affirmative Defenses to Plaintiff's First Amended Complaint and Counterclaims Against Plaintiff Katherine Sweeney, states and alleges as follows. [1]

---

[1] Plaintiff Katherine Sweeney ("Plaintiff" or "Sweeney") commenced this action, naming only AIME as a defendant, in state court by filing the Original Petition in the 48th District Court in and for Tarrant County, Texas, on or about February 28, 2025. On April 10, 2025, AIME removed the action to Federal Court and served its initial Answer, Affirmative Defenses and Counterclaims a week later. (ECF Nos. 1, 6). Plaintiff timely (pursuant to a stipulated extension) responded to AIME's counterclaims on August 27, 2025. (ECF No. 26). AIME then filed and served an Amended Answer, Affirmative Defenses and Counterclaims on September 10, 2025, and Sweeney timely (again pursuant to a stipulated extension of the deadline) filed her reply on October 1, 2025. (ECF Nos. 28, 33). On October 28, 2025, Sweeney

## ANSWER

1. AIME denies each and every allegation, matter and thing set forth in Plaintiff's First Amended Complaint (ECF No. 42; the "Amended Complaint") unless otherwise admitted or qualified herein.

2. AIME is without sufficient information to admit or deny the averments and allegations contained in Paragraph 1.1 of the Amended Complaint and therefore denies the same and puts Plaintiff to her strictest burden with respect thereto.

3. AIME admits the averments and allegations contained in Paragraph 1.2 of the Amended Complaint as they relate to AIME being a non-profit corporation formed pursuant to the laws of the State of Michigan. As for the remaining averments and allegations contained in Paragraph 1.2 of the Amended Complaint, including that it has "appeared before the Court for all purposes," AIME denies each and every one of them and puts Plaintiff to her strictest burden with respect thereto.

---

moved to amend her complaint adding claims against Defendants United Wholesale Mortgage, LLC and Sarah DeCiantias. (ECF No. 34).  The Court granted that motion on December 11, 2025, and Sweeney filed her First Amended Complaint the same day. (ECF Nos. 41 and 42). For ease of readership, AIME identifies this document as its Answer and Affirmative Defenses to First Amended Complaint and Counterclaims against Plaintiff Katherine Sweeney, and acknowledges that this document is AIME's operative pleading in this matter.

4. The averments and allegations contained in Paragraph 1.3 and 1.4 of the Amended Complaint are directed and in relation to AIME's Co-Defendant, United Wholesale Mortgage, LLC ("UWM").  Accordingly, a response from AIME is not required. To the extent a response to the allegations is required from AIME, AIME is without sufficient information to admit or deny the averments and allegations contained in Paragraph 1.3 and 1.4 of the Amended Complaint, and it therefore denies the same and puts Plaintiff to her strictest burden with respect thereto.

5. The averments and allegations contained in Paragraph 1.5 and 1.6 of the Amended Complaint are directed and in relation to AIME's Co-Defendant, Sarah DeCiantis ("DeCiantis").  Accordingly, a response from AIME is not required. To the extent a response to the allegations is required from AIME, AIME is without sufficient information to admit or deny the averments and allegations contained in Paragraph 1.5 and 1.6 of the Amended Complaint, and it therefore denies the same and puts Plaintiff to her strictest burden with respect thereto.

6. The averments and allegations contained in Paragraph 2.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 2.1 is deemed to state a factual allegation requiring admission or denial, AIME admits that the amount in controversy exceeds the

minimum jurisdictional requirements for diversity jurisdiction, but states that it does not have sufficient information to admit or deny the citizenship of UWM or DeCiantis. Except as explicitly admitted, AIME denies any remaining allegation in Paragraph 2.1 of the Amended Complaint.

7. The averments and allegations contained in Paragraph 2.2 of the Amended Complaint constitute legal conclusions to which no response is required. To the extent Paragraph 2.2 is deemed to state a factual allegation requiring admission or denial, AIME denies these allegations and puts Plaintiff to her strictest burden with respect thereto.

8. With respect to the averments and allegations contained in Paragraph 3.1 of the Amended Complaint, AIME admits that it is a nationwide non-profit trade organization for mortgage brokers and that Marc Summers ("Summers") has served as AIME's President since 2018. AIME denies the remaining averments and allegations contained in Paragraph 3.1 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

9. With respect to the averments and allegations contained in Paragraph 3.2 of the Amended Complaint, AIME admits that it was formed in February 2018; and that BAB Management, LLC, f/k/a/ Brokers are Better, LLC ("BAB") was formed by Casa and Sweeney (and potentially others) approximately 18 months later. AIME denies the remaining averments and allegations contained

in Paragraph 3.2 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

10. With respect to the averments and allegations contained in Paragraph 3.3 of the Amended Complaint, AIME admits that its financials improved during 2021 and 2022. AIME denies the remaining averments and allegations contained in Paragraph 3.2 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

11. AIME denies the averments and allegations contained in Paragraphs 3.4, 3.5, 3.6, 3.7, and 3.8 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

12. With respect to the averments and allegations contained in Paragraph 3.9 of the Amended Complaint, AIME admits that the document identified as the Transition Agreement and Mutual Release (the "Transition Agreement") was drafted and prepared by Plaintiff. The Transition Agreement speaks for itself and to the extent the averments and allegations in Paragraph 3.9 of the Amended Complaint differ from the Transition Agreement, they are denied. AIME denies that the Transition Agreement was a legally valid contract, denies the remaining averments and allegations in Paragraph 3.9 of the Amended Complaint, and puts Plaintiff to her strictest burden with respect thereto. Except as explicitly admitted herein, AIME denies each and every

averment and allegation contained in Paragraph 3.9 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

13. With respect to the averments and allegations contained in Paragraph 3.10 of the Amended Complaint, AIME states that the Transition Agreement speaks for itself and to the extent the averments and allegations in Paragraph 3.10 of the Amended Complaint differ from the Transition Agreement, they are denied. AIME also affirmatively states that the Transition Agreement was void *ab initio,* voidable, or otherwise unenforceable, and of no legal effect. Except as explicitly admitted herein, AIME denies each and every averment and allegation contained in Paragraph 3.10 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

14. With respect to the averments and allegations contained in Paragraph 3.11 of the Amended Complaint, AIME admits that it has not paid the monies referred to in the Amended Complaint as the "2023 Bonus" to Plaintiff, but affirmatively denies that it had any legal obligation to make such payment. AIME denies the remaining averments and allegations in Paragraph 3.11 of the Amended Complaint, and puts Plaintiff to her strictest burden with respect thereto. Except as explicitly admitted herein, AIME denies each and every averment and allegation contained in Paragraph 3.11 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

15. With respect to the averments and allegations contained in Paragraph 3.12 of the Amended Complaint, AIME admits that it made nine (9) monthly installment payments each in the amount of $20,000—a total of $180,000— to Plaintiff. AIME denies that it was legally obligated to make such payments and affirmatively alleges that it is entitled to a refund of such payments. As to the remaining averments and allegations contained in Paragraph 3.12 of the Amended Complaint, AIME denies each and every one of them and puts Plaintiff to her strictest burden with respect thereto.

16. In response to the averments and allegations contained in Paragraph 3.13 of the Amended Complaint, AIME denies that it owed Sweeney $300,000, denies that Sweeney earned a bonus of $240,000 or that AIME promised to pay such bonus, and denies that Sweeney is owed a $60,000 balance on any "Severance Payment". As to the remaining averments and allegations in Paragraph 3.13 of the Amended Complaint, AIME is without sufficient information to admit or deny such averments and allegations, and therefore denies the same and puts Plaintiff to her strictest burden with respect thereto. Subject to and without waiver of this denial, AIME admits that it received a letter via electronic mail from an attorney purporting to represent Plaintiff on or about January 27, 2025, and that it responded through counsel on January 31, 2025. Those letters speak for themselves, and, to the extent that Paragraph

3.13 of the Amended Complaint conflicts with the contents of those letters, such allegations are denied. AIME further repeats its admission that it has not paid Plaintiff the purported "2023 Bonus" or the final $60,000 under the purported "Severance Payment," but affirmatively states that it was under no legal obligation to do so.

17. AIME denies the averments and allegations contained in Paragraph 3.14 of the Amended Complaint and puts Plaintiff to her strictest burden with respect thereto.

18. Paragraph 3.15 of the Amended Complaint is a summary of the claims asserted by Plaintiff and a listing of the category of damages that she is seeking in this action. As such, no response is required. If and to the extent a response is required, AIME affirmatively denies any wrong doing, denies any liability for any damages, denies the averments and allegations contained in Paragraph 3.15 of the Amended Complaint, and puts Plaintiff to her strictest burden with respect thereto.

19. Paragraph 4.1 of the Amended Complaint incorporates the allegations set forth in preceding paragraphs into the various causes of action asserted by Plaintiff, and as such no response is required.  If and to the extent a response is required, AIME realleges and reincorporates all of its responses to the

averments and allegations contained above as though fully set forth herein and hereunder.

20. The averments and allegations contained in Paragraph 5.1 of the Amended Complaint constitute legal conclusions to which no response is required. To the extent Paragraph 5.1 is deemed to state a factual allegation requiring admission or denial, AIME denies these allegations and puts Plaintiff to her strictest burden with respect thereto.

21. The averments and allegations contained in Paragraph 5.2 of the Amended Complaint constitute legal conclusions to which no response is required. To the extent Paragraph 5.2 is deemed to state a factual allegation requiring admission or denial, AIME denies these allegations and puts Plaintiff to her strictest burden with respect thereto.

22. As drafted, the averments and allegations contained in Paragraph 6.1 of the Amended Complaint assert claims against UWM and DeCiantis (and not against AIME), and therefore no response from AIME is required.  If and to the extent a response from AIME is required, AIME denies the allegations in Paragraph 6.1 and puts Plaintiff to her strictest burden with respect thereto.

23. The averments and allegations contained in Paragraph 7.1 of the Amended Complaint constitute legal conclusions to which no response is required. If

and to the extent Paragraph 7.1 is deemed to state factual allegations requiring admission or denial, AIME denies the allegations.

24. The averments and allegations contained in Paragraph 8.1 of the Amended Complaint constitute legal conclusions to which no response is required. To the extent Paragraph 8.1 is deemed to state factual allegations requiring admission or denial, AIME denies these allegations. AIME further notes that the provisions of the Texas Rules of Civil Procedure are not controlling on this Court and has no further relevance to this action in light of the removal. AIME further affirmatively states that the Transition Agreement was void *ab initio,* voidable, or otherwise unenforceable, and that any attorney-fee provision in the Transition Agreement is therefore of no legal affect.

25. In response to Section 9 of the Amended Complaint captioned "PRAYER," AIME denies that Plaintiff is entitled to any of the relief requested therein.

### AFFIRMATIVE DEFENSES

As and for AIME's affirmative defenses, AIME states and alleges as follows:

1. The Amended Complaint fails to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred in their entirety since Plaintiff seeks to enforce a contract (specifically, the Transition Agreement) that is void *ab initio,* voidable, or otherwise unenforceable.

3. Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraud, as discussed in more detail below.

4. The claims put forth in the Amended Complaint are barred by the doctrines of waiver and estoppel, accord and satisfaction, unclean hands, unjust enrichment, license, ratification, and justification.

5. Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of laches.

6. Plaintiff's claims are barred due to prior breach or breaches of contract or failure of conditions precedent.

7. Plaintiff's claims are barred due to illegality.

8. Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, are a direct or proximate result of Plaintiff's own action, inaction, conduct, or performance.

9. Plaintiff's claims are barred, in whole or in part, by Plaintiff's violation of her fiduciary duties that she owed to AIME.

10. Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, are a direct or proximate result of the actions, conduct or performance of third parties over whom AIME has no control.

11. Plaintiff's claims are barred, in whole or in part, because AIME's conduct, acts, and omissions were not the proximate cause of any damages Plaintiff is alleged to have incurred (the occurrence of which AIME denies).

12. Plaintiff's claims are barred, in whole or in part, because Plaintiff suffered no compensable damages.

13. AIME preserves any and all additional affirmative defenses available under Rule 8(c) of the Federal Rules of Civil Procedure, which may be asserted or discovered in discovery in this matter.

**COUNTERCLAIMS**[2]

AIME, as and for its counterclaims against Plaintiff, states as follows:

## I.    AIME

1. On February 5, 2018, AIME was incorporated when it filed its Articles of Incorporation with the Michigan Department of Licensing and Regulatory Affairs ("LARA").

2. On February 8, 2018, AIME filed Amended Articles of Incorporation with LARA.

---

[2] With the exception of this explanatory footnote and minor formatting adjustments (which in some cases has altered numbering of paragraphs), the Counterclaims asserted by AIME in this pleading are substantively identical to those asserted in its September 10, 2025 "Amended Answer, Affirmative Defenses, and Counterclaims." (ECF No. 28).

3. On or about November 7, 2018, the Department of Treasury, Internal Revenue Service ("IRS") issued its determination that AIME qualified as a non-profit organization under Section 501(c)(3) of the Internal Revenue Code, effective February 5, 2018.

4. On December 10, 2019, AIME filed its 2019 Annual Report with LARA, identifying the following Officers and Directors:

   a. Marc Summers ("Mr. Summers") (President, Treasurer, Secretary, and Director);

   b. Stephanie Gray ("Ms. Gray") (as Secretary);

   c. Anthony Casa (as Director); and

   d. Ms. Sweeney (as Director).

5. On September 3, 2020, and September 29, 2021, AIME certified to LARA that there had been no changes in the required information since the filing of the previous Annual Report.

6. On August 30, 2022, AIME filed its 2022 Annual Report with LARA, identifying the following Officers and Directors:

   a. Mr. Summers (as President, Treasurer, and Director);

   b. Ms. Gray (as Secretary);

   c. Ms. Sweeney (as Director); and

     d.  Karis Koehn ("Ms. Koehn") (as Director).[3]

7.  On September 29, 2023, and August 21, 2024, AIME certified to LARA that there had been no changes in the required information since the 2022 Report had been filed.

8.  Beginning with its 2021 IRS Form 990, AIME identified three individuals under Part VIII, Section A as officers or directors: Mr. Summers (as President), Ms. Sweeney (as Chairman), and Ms. Koehn (as Director). Each of the three were identified as receiving compensation from AIME, in an amount ranging from $120,833 (for Mr. Summers) to $240,000 (for Ms. Sweeney). Of the three, only Ms. Sweeney is listed on Schedule J.

9.  Mr. Summers, Ms. Sweeney, and Ms. Koehn were similarly the only individuals listed under Part VIII, Section A as officers or directors on AIME's 2022 IRS Form 990. Mr. Summers and Ms. Koehn reported similar compensation as the previous year, while Ms. Sweeney's compensation nearly doubled to $479,990 on an average of thirty (30) hours per week. As with 2021, only Ms. Sweeney is listed in AIME's 2022 Schedule J.

---

[3] In certain documents, Ms. Koehn's name is misspelled as "Kohen." In this Answer, AIME treats the misspelling as a scrivener's error, and corrects the spelling to "Koehn" without further comment.

10. According to AIME's Bylaws, AIME's Board of Directors consisted of, in part, the President and Chairman. A copy of AIME's Bylaws are attached hereto and incorporated herein as **Exhibit A**.

11. As Director and Chairman, Ms. Sweeney owed fiduciary duties of loyalty and care to both AIME and its members.

12. From 2018 through the present, AIME's Bylaws have prohibited payment of compensation to Directors for their service on the Board of Directors.

13. From 2018 through May 2024, AIME's Bylaws prohibited payment of compensation to the Chairman. AIME adopted amended Bylaws on May 21, 2024, that permitted compensation to Officers as approved by the Board of Directors, determined using a process that includes a review and approval by independent persons. These limitations were never followed as related to Ms. Sweeney. A copy of the Amended Bylaws is attached hereto as **Exhibit B**.

## II.    The Transition Agreement

14. On or about January 16, 2024, Ms. Sweeney executed a document captioned Transition Agreement and Mutual Release (the "Transition Agreement"), a true and correct copy of which is attached as **Exhibit C** hereto.

15. The Transition Agreement was also signed by Mr. Summers, AIME's President, at around the same time. Mr. Summers signed the Transition Agreement at Ms. Sweeney's direction and insistence as the Chairman, and

while Mr. Summers is noted on the face of the Transition Agreement as AIME's "authorized representative," the Transition Agreement was never presented to nor approved by a vote of AIME's Board of Directors.

16. Under Paragraph 1 of the Transition Agreement, Ms. Sweeney purportedly resigned "her employment" with AIME, effective March 31, 2024.

17. Under Paragraph 2 of the Transition Agreement, AIME purportedly acknowledged that Ms. Sweeney had earned a bonus in the amount of $240,000 (the "2023 Bonus") and purportedly agreed to pay the 2023 Bonus no later than February 29, 2024. The Transition Agreement does not provide any detail on how the 2023 Bonus was calculated, what metrics were considered in determining whether Ms. Sweeney had "earned" the 2023 Bonus, or any additional details.

18. Under Paragraph 3 of the Transition Agreement, AIME purportedly agreed to pay Ms. Sweeney the sum of $240,000 (the "Alleged Severance Payment") in twelve (12) monthly installments of $20,000 each, beginning April 15, 2024.

19. While the Transition Agreement refers to Ms. Sweeney as an "Employee," this is a misnomer. At the time the Transition Agreement was executed, Ms. Sweeney was not an "employee" of AIME, but rather a Director and Officer.

20. AIME's Board of Directors did not, either contemporaneously or after the fact, approve of the Transition Agreement. Rather, it appears that the

Transition Agreement was unilaterally prepared and drafted by Plaintiff, negotiating her own purported exit package from AIME, and presented to Summers with a demand for signature.

21. Plaintiff left AIME at the end of March 2024, and has not served as either an Officer or Director of AIME since that time.

### III.  The Sponsorship Agreement

22. Following Ms. Sweeney's 2024 departure from AIME, AIME became aware of the alleged Sponsorship Agreement dated January 2, 2022 ("Sponsorship Agreement"), between BAB Management, LLC d/b/a The Mortgage Xchange f/k/a Brokers Are Better, LLC ("BAB")[4] and AIME.

23. The Sponsorship Agreement—allegedly executed by Karis A. Koehn, as SVP of Business development on behalf of AIME, and Ms. Sweeney, as Partner of

---

[4] According to BAB's filings with the Maryland Secretary of State, BAB is a Maryland limited liability company that has a registered office address of 5000 Thayer Center, Suite C, Oakland, Garrett County, Maryland 21550. Upon information and belief, as of December 15, 2020, BAB has three members: (1) Strategic Mortgage Consulting Partners, LLC; (2) Strategic Compliance Partners, LLC; and (3) KMSS Consulting, LLC. Upon information and belief, Strategic Mortgage Consulting Partners, LLC is a Pennsylvania limited liability company organized by Anthony Casa, and has a registered office address of 2531 Graduate Square, Philadelphia, Pennsylvania 19146. Upon information and belief, Strategic Compliance Partners, LLC is a Maryland limited liability company organized by Ari Karen and has a registered office address of 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202. Upon information and belief, KMSS Consulting, LLC is a Texas limited liability company organized by Ms. Sweeney and has a registered office address of 3212 Wycliff Avenue, Dallas, Texas 75219.

BAB on its behalf, purported to require AIME to provide specific benefits to
BAB such as, but without limitation, the following:

    a.  The right to promote its relationship with AIME;

    b.  The right to negotiate revenue share agreements to provide discounts
with vendor partners on behalf of AIME's members;

    c.  Use of BAB exclusively for vendor discounts;

    d.  Access to membership (including retaining full admin and moderator
access) to the following Facebook groups: Brokers Are Better, WMN
and any other private member group AIME establishes, contact and
lead lists; and

    e.  Promotion of BAB vendor discount programs, 10x20 booth space at
AIME's national conference (i.e., Fuse), and any other AIME event that
provides exhibitor space.

24. In exchange, BAB would provide AIME with a $0 cost sponsorship, and
license to use BrokersAreBetter.com and Brokers Are Better trademark for
promotional purposes including t-shirts, podcasts, etc.[5]

25. Through the use of BAB and Ms. Sweeney's access (including admin and
moderator access) to AIME's exclusive membership Facebook groups, other

---

[5] Ms. Sweeney and BAB's purported consideration to AIME under the Sponsorship
Agreement was a license to AIME to use trademarks (i.e., "Brokers Are Better") that
AIME already had exclusive right and title to.

AIME private member groups, and AIME's contact and lead lists, Ms. Sweeney redirected contracts away from AIME members and vendors to BAB.

26. Upon information and belief, Ms. Sweeney led at least two (2) entities that entered into a contract with BAB to believe that they were in fact contracting with AIME, and those entities were surprised to learn that money paid under those contracts was not received by AIME, but BAB.

27. As with the Transition Agreement, neither AIME's Board of Directors nor a disinterested majority thereof ever formally ratified or approved of the Sponsorship Agreement.

### COUNTERCLAIM COUNT I
### (Declaratory Judgment: Transition Agreement)

28. AIME repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

29. Under Michigan law, payment of salary to an officer or director is not strictly prohibited, but must comply with the nonprofit's articles of incorporation and bylaws.

30. At all times while Ms. Sweeney was an officer and director of AIME, AIME's Bylaws prohibited payment of compensation (as opposed to reimbursement for expenses actually incurred) to officers and directors.

31. Paragraphs 2 and 3 of the Transition Agreement violate AIME's Bylaws and, by extension, Michigan statute.

32. Under Michigan law, nonprofit corporations (such as AIME) may take action either by a vote during a meeting or by written action (unless prohibited by the articles of incorporation or bylaws) if all members of the board of directors consent to the action in writing and the written action is filed with the other minutes of the nonprofit corporation.

33. The Transition Agreement was not approved by vote of the Board of Directors at a meeting.

34. AIME's Bylaws at the time permitted the Board of Directors to take action without a meeting if both the Chairman and President adopt a written resolution authorizing the action *and* that written action is filed with the minutes of the proceedings of AIME's Board of Directors. There was no written resolution adopted by the Chairman and President authorizing the Transition Agreement, and no such written action was filed with the minutes of the proceedings of AIME's Board of Directors.

35. In addition, the person signing the Transition Agreement did not have the authority under AIME's By-Laws to execute the same on behalf of AIME. His authority, if any, was specifically limited under the AIME By-Laws and the amounts to be paid under the Transition Agreement, as well as the value

of the release of any claims under the same, exceeded that authority. As required by TEX. CIV. PRAC. & REM. CODE § 37.006, all persons or entities who have or claim any interest that would be affected by a declaration of the validity (or lack thereof) of the Transition Agreement are parties to this action.

36. Accordingly, AIME is entitled to a declaration under the Uniform Declaratory Judgments Act, codified at Chapter 37 of the Texas Civil Practice and Remedies Code, that the Transition Agreement (including but not limited to the payment provisions in Paragraphs 2 and 3 and the purported release in Paragraph 5) is void *ab initio*, *ultra vires*, voidable, or otherwise unenforceable, that the Transition Agreement is rescinded, and that AIME is entitled to a complete accounting of any amounts paid to Ms. Sweeney in connection with the Transition Agreement.

## COUNTERCLAIM COUNT II
### (Breach of Fiduciary Duties: Transition Agreement)

37. AIME repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

38. Dating at least as far back as 2021, Plaintiff has, among other things, received compensation from AIME either as an officer or as a director, despite the fact

that AIME's Bylaws specifically prohibited her from receiving such compensation.[6]

39. As an officer and director of AIME, Plaintiff owed AIME and its members a duty of loyalty and care, including a duty to act in good faith, a duty to act with the care of an ordinarily prudent person in a like position exercising such care under similar circumstances, and a duty to act in a manner reasonably believed to be in the best interests of the corporation.

40. By awarding herself a salary and bonus, and by drafting and demanding that the Transition Agreement be signed by AIME, and by accepting compensation to which she was not entitled – and in fact was prohibited from receiving – Plaintiff breached her fiduciary duties to AIME.

41. At no time did Plaintiff seek Board approval or approval from any outside disinterested party. Instead, contrary to AIME's Bylaws, she engaged in self-serving conduct that directed payments of over $900,000 to her personally. These payments were contrary to the internal and governing documents of AIME, as applied to the Plaintiff, and should be clawed back.[7]

---

[6] While an argument could potentially be made that Sweeney was an employee, the 2018 By-Laws specifically provided that as Chairman she was not entitled to compensation.

[7] While not intended to be an exhaustive list of Plaintiff's self-dealing, in 2024 (after Ms. Sweeney's departure), AIME learned that, over a two-year time span, Ms. Sweeney had used AIME personnel, administrative tools and resources, and access

42. As a result of Plaintiff's breach of her fiduciary duties to AIME, AIME has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees as more fully articulated below:

    a.  At least $240,000 in compensation received by Plaintiff in 2021;

    b.  At least $479,999 in compensation received by Plaintiff in 2022;

    c.  Any amount received as compensation by Plaintiff in 2023; and

    d.  Any amount received as compensation by Plaintiff in 2024.

### COUNTERCLAIM COUNT III
### (Breach of Fiduciary Duties: Sponsorship Agreement)

43. AIME repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

44. In and around 2022, Plaintiff was an officer and director of AIME.

---

to data on AIME's members to craft, invoice, and collect on for-profit contracts between third-party organizations on the one hand and companies in which Ms. Sweeney held a vested interest on the other. Additionally, while serving as a Director and Chairman of AIME, Ms. Sweeney founded Broker Action Coalition, Inc. ("BAC"), a Delaware corporation, and ran BAC parallel with AIME to negotiate contracts with lender partners that diverted monetary contributions away from AIME to BAC. These intrusions and diversion of opportunity continue as Plaintiff has created a mechanism to divert internet traffic from AIME to websites that are under her control, giving the user, upon information and belief, the false impression that it is interfacing with AIME. Despite repeated requests for this practice to cease, Plaintiff has refused.

45. In and around 2022, Plaintiff simultaneously held membership interest in BAB.

46. On or around January 1, 2022, Plaintiff allegedly executed the Sponsorship Agreement between BAB and AIME, as Partner of BAB on its behalf, while also serving as AIME's officer and director.

47. According to Section 10.05 of AIME's Bylaws, as officer and director of AIME, Ms. Sweeney was required to disclose her interest in BAB to AIME's entire Board of Directors and a majority of disinterested directors were required to ratify and approve the Sponsorship Agreement, otherwise, the Sponsorship Agreement would be invalid.

48. As an officer and director of AIME, Plaintiff owed AIME a fiduciary duty to disclose the conflict-of-interest arising from Plaintiff's direct or indirect, pecuniary or otherwise, membership interest in BAB.

49. At no time did Plaintiff disclose or seek ratification or approval from the remaining disinterested Board of Directors of AIME. Instead, contrary to AIME's Bylaws, Plaintiff utilized her position as officer and director of AIME to engage in further self-serving conduct that redirected AIME members and vendors away from AIME and to BAB.

50. By entering into the Sponsorship Agreement without disclosing Plaintiff's membership interest in BAB and redirecting AIME member and vendor

contracts and transactions away from AIME but to BAB, Plaintiff breached her fiduciary duties to AIME.

51. As a result of Plaintiff's breach of her fiduciary duties to AIME, AIME has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees.

### COUNTERCLAIM COUNT IV
### (Fraud: Transition Agreement)

52. AIME repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

53. At the time that Plaintiff signed the alleged Transition Agreement and at the time Plaintiff presented the alleged Transition Agreement to Marc Summers and demanded that Mr. Summers sign the alleged Transition Agreement on behalf of AIME, Plaintiff was an officer and director of AIME.

54. As an officer and director of AIME, Plaintiff had a duty to disclose to AIME all material facts related to the alleged Transition Agreement.

55. At the time Plaintiff signed the Transition Agreement and at the time Plaintiff presented the alleged Transition Agreement to Marc Summers and demanded that Mr. Summers sign the alleged Transition Agreement on behalf of AIME, Plaintiff intentionally omitted, concealed, and failed to disclose to AIME the following materials facts:

a. That the Sponsorship Agreement had been signed without approval by AIME's Board of Directors or a disinterested majority of such Board of Directors.

b. The benefits that BAB had received, was receiving, and would continue to receive under the Sponsorship Agreement.

c. The benefits that Plaintiff had personally received, was receiving, and would continue to receive under the Sponsorship Agreement.

d. That Plaintiff had used her access (including admin and moderator access) to AIME's exclusive membership Facebook groups, other AIME private member groups, and AIME's contact and lead lists to redirect actual and potential members and vendors away from AIME and to BAB.

e. That Plaintiff had led entities that entered into contracts with BAB to believe that they were in fact contracting with AIME.

f. That Plaintiff had used AIME's personnel, administrative tools and resources, and access to data on AIME's members to craft, invoice, and collect on for-profit contracts between third-party organizations on the one hand and companies in which Plaintiff held a vested interest on the other.

g. That Plaintiff ran BAC parallel with AIME to negotiate contracts with lender partners that diverted monetary contributions away from AIME to BAC.

h. That Plaintiff had created a mechanism to divert internet traffic from AIME to websites that are under Plaintiff's control, giving the user the false impression that it is interfacing with AIME.

i. That Plaintiff had registered the phrase "Brokers are Better" with the United States Patent and Trademark Office (the "USPTO") indicating in that filing that it belonged to her and BAB, when in fact, it appropriately belongs to AIME.

j. That Plaintiff maintained and would continue to maintain control of AIME's website after her departure from AIME.

56. In addition, Plaintiff deliberately failed to disclose to AIMEs' Board of Directors and to a disinterested majority of such Board of Directors the material fact that she was an officer and director of AIME and stood to personally benefit from the alleged Transition Agreement.

57. As both director and officer of AIME, Plaintiff had a duty to disclose her fiduciary relationship with AIME when she purportedly entered into the Transition Agreement because there existed a conflict-of-interest, whereby

Plaintiff stood to and, in fact, did personally benefit from the alleged Transition Agreement.

58. AIME was ignorant or Plaintiff was silent as to the Transition Agreement allegedly entered into with Ms. Sweeney, because, upon information and belief, the Transition Agreement was only set forth by Marc Summers and Ms. Sweeney and was not disclosed to the remainder of AIME's Board of Directors.

59. Plaintiff intended AIME to allegedly enter into the Transition Agreement and to perform under the Transition Agreement based on Plaintiff's non-disclosure, omission, and concealment as set forth above.

60. AIME relied on Plaintiff's non-disclosures, omissions, and concealments as set forth above.

61. To the extent that Marc Summers' signature on the Transition Agreement is deemed to be a valid signature on behalf of AIME (which AIME expressly denies) such signature would not have been made if Plaintiff had disclosed all material facts in connection with the Transition Agreement.

62. AIME also relied on Plaintiff's non-disclosures, omissions, and concealments as set forth above by making payments to Plaintiff pursuant to the Transition Agreement. Such payments would not have been made if Plaintiff had disclosed all material facts in connection with the Transition Agreement.

63. As a result of Plaintiff's fraudulent non-disclosures, omissions, and concealments, AIME has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees.

64. In addition, as a result of Plaintiff's fraud, the Transition Agreement is void, voidable, or otherwise unenforceable.

### COUNTERCLAIM COUNT V
### (Unjust Enrichment)

65. AIME repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

66. Through receipt of compensation for her role as either an officer or director of AIME, Plaintiff was conferred a benefit of which she was fully aware.

67. Plaintiff retained the monies paid to her as compensation despite her knowledge that such compensation was not permitted (and, in fact, was prohibited) by AIME's Bylaws.

68. Allowing Plaintiff to retain the payments made to her would be inequitable.

69. As a result of these inequitable circumstances, AIME has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees as more fully articulated below:

   a. At least $240,000 in compensation received by Plaintiff in 2021;

   b. At least $479,999 in compensation received by Plaintiff in 2022;

   c. Any amount received as compensation by Plaintiff in 2023; and

d.  Any amount received as compensation by Plaintiff in 2024.

**PRAYER FOR RELIEF**

**WHEREFORE**, AIME respectfully requests relief from this Court as follows:

1. Declare pursuant to the Uniform Declaratory Judgments Act that the Transition Agreement is void *ab initio*, *ultra vires*, voidable, or otherwise unenforceable;

2. Declare pursuant to the Uniform Declaratory Judgments Act that the Transition Agreement be rescinded in full;

3. Order a complete accounting of all amounts paid to Ms. Sweeney by AIME in connection with the Transition Agreement;

4. Order that all amounts paid to Ms. Sweeney by AIME in connection with the Transition Agreement be returned to AIME;

5. That judgment be entered in favor of AIME against Ms. Sweeney in an amount to be determined at trial but in excess of $75,000 (exclusive of interest, costs, and disbursements) for AIME to recoup the compensation impermissibly paid to Ms. Sweeney;

6. Award AIME its fees and costs (including reasonable attorney fees) to the fullest extent permitted by law; and

7. Such other relief as the Court may determine just and warranted.

Respectfully Submitted,

**MADIGAN, DAHL & HARLAN, P.A.**

Dated: December 23, 2025

*/s/ Thomas P. Harlan*
Thomas P. Harlan, (MN Bar No. 210870), *pro hac vice*
Christopher W. Bowman (MN Bar No. 389933), *pro hac vice*
Trenton K. Seegert (MN Bar No. 504174), *pro hac vice*
33 South Sixth Street, Suite 3675
Minneapolis, MN 55402
Phone: 612-604-2000
harlan@mdh-law.com
bowman@mdh-law.com
seegert@mdh-law.com

 *-and-*

**DROEL PLLC**

Tim L. Droel (TX Bar No. 24075548)
Evan H. Weiner (MN Bar No. 389176), *pro hac vice*
5625 F.M. 1960 West, Suite 214
Houston, TX 77069
Phone: (832) 701-9905
tdroel@droellaw.com

*Attorneys for Defendant Association of Independent Mortgage Experts*